IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STEVE ARMBRUSTER, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | NO. 09-1006 |
| | : | |
| v. | : | |
| | : | |
| JOHN C. CAVANAUGH, et al., | : | |
| | : | |
| Defendants. | : | |

**Jones II, J.**                                                                                                              **March 9, 2010**

## MEMORANDUM

This matter arises out of an incident that occurred during a disruptive protest on the campus of Kutztown University on April 18, 2007, when Corporal Steve Armbruster ("Plaintiff" or "Armbruster") disagreed with orders given by his superiors, questioned and declined to follow them, and was subsequently relieved of duty and subjected to discipline. Armbruster has brought suit against (1) the Chancellor of the Pennsylvania State System of Higher Education John C. Cavanaugh ("Cavanaugh"); (2) Kutztown University President F. Javier Cevallos ("Cevallos"); and (3) Chief of Police of Kutztown University William F. Mioskie ("Mioskie"). Armbruster alleges two causes of action against each defendant pursuant to 42 U.S.C. § 1983. The first cause of action alleges retaliation for exercising the right to free speech under the First Amendment. The second cause of action alleges violation of a purported "right to refuse to violate others' constitutional rights." Armbruster requests declaratory relief, injunctive relief, and damages.

This lawsuit was filed on March 6, 2009. A Motion to Dismiss was filed on May 21, 2009. This Court allowed Plaintiff to file an Amended Complaint on July 6, 2009. Defendants

filed a Motion to Dismiss the Amended Complaint on July 16, 2009 (Docket No. 7). The Court held oral argument on the Motion to Dismiss on October 5, 2009. Presently before the Court is the Motion to Dismiss and Plaintiff's Response thereto. The Court has carefully considered the written and oral arguments advanced by counsel. The Court will grant the Motion to Dismiss.

## I. Legal Standard

In deciding a motion to dismiss pursuant to Rule 12(b)(6), courts must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (internal quotation and citation omitted). After the Supreme Court's decision in Bell Atl. Corp. v. Twombly, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, — U.S. —, 129 S.Ct. 1937, 1949 (2009) (citing Twombly, 550 U.S. 544, 555 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S.Ct. at 1949 (citing Twombly, 550 U.S. at 556). This standard, which applies to all civil cases, "asks for more than a sheer possibility that a defendant has acted unlawfully." Id. See also Fowler v. UPMC Shadyside, 578 F.3d 203, 210-211 (3d Cir. 2009) ("All civil complaints must contain more than an unadorned, the-defendant-unlawfully-harmed-me accusation.") (internal quotation omitted).

Where a plaintiff has already filed an amended complaint in an attempt to cure the failures in his initial complaint, the Court may determine that additional amendment would be inequitable or futile, and dismiss the complaint with prejudice. Phillips, 515 F.3d at 236.

## II. Facts As Alleged

Plaintiff has been a police officer with the Kutztown University Police Department for 17 years. Compl. ¶ 11. On April 18, 2007, approximately fifteen individuals associated with a group known as "Repent America" demonstrated at an outdoor location on the Kutztown University campus. Id. at ¶ 12. During the demonstration, approximately 300 counter-demonstrators (representing several different organizations and clubs), also assembled. Id. at ¶ 13. The counter-demonstration became loud, and the Repent America group was asked by Armbruster and another officer to move away from certain buildings, at which time Repent America began to do so. Id. at ¶ 14. Various students became upset and contacted university personnel about the content of Repent America's message. Id. at ¶ 15.

Other police officers and Chief Mioskie responded to the scene, along with University President Cevallos. Id. at ¶ 16. Cevallos asked Armbruster to "push" Repent America off campus. Id. at ¶ 17.[1] Armbruster did not reply to President Cevallos's request. Id. at ¶ 19. President Cevallos then approached Mioskie with the same request. Id. Mioskie determined that the situation was disorderly because the counter-demonstrators had become upset with Repent America's demonstration. Id. at ¶ 20. Mioskie began telling the leader of Repent America that the members of that group had to leave campus. Id. at ¶ 21.

Mioskie then ordered Armbruster to "push" Repent America off campus. Id. at ¶ 22. Armbruster objected to the chief's order, opining that it violated the group's civil rights. Id. at ¶

---

[1] Paragraph 18 of the Amended Complaint alleges that "President Cevallos considered some of the speech offensive and necessary to be removed." This clearly is speculation, as it is not accompanied by any allegation that Cevallos communicated any such belief to anyone. The only credibly alleged fact is that Cevallos asked Armbruster to move Repent America off campus.

23. Armbruster believed that in following Mioskie's order, he would be asked to threaten Repent America members with arrest under a "disorderly conduct statute." Id. at ¶ 24. Armbruster further believed that Mioskie's order to disperse Repent America was "wrong." Id. at ¶ 25. Armbruster also feared that limiting Repent America's ability to demonstrate would "subject him to liability." Id.[2] After Armbruster spoke his objections, Mioskie relieved Armbruster of the duties he was performing and told Armbruster to leave the scene to which he had been previously called to duty. Id. at ¶ 28.

Cevallos has oversight of the Kutztown Police Department disciplinary process, and Mioskie directs that process. Id. at ¶ 39. On April 20, 2007, Armbruster was notified that he was placed on paid administrative leave for his conduct at the demonstration and was asked not to report for duty or to be on campus for three shifts prior to a Pre-Discipline Conference scheduled for April 23, 2007. Id. at ¶ 31. Armbruster believed that Mioskie and Cevallos together determined that Armbruster should be placed on leave and that a Pre-Discipline Conference should be conducted because of Armbruster's behavior while on duty at the demonstration. Id. at ¶ 32. Following the Pre-Discipline Conference, Armbruster was given official notice of suspension without pay for five working days for failure to carry out a direct order to remove persons who were ordered to disperse due to disorderly actions. Id. at ¶ 33. As a result of the

---

[2] Paragraphs 26 ("Corp. Armbruster did not have an employment duty that required him to inform the Chief of the unconstitutionality of the situation, but instead he spoke as any other citizen concerning a matter of public concern, the violation of demonstrators' rights under the First Amendment.") and 27 ("Corp. Armbruster's brief statement did not undermine the orderly working of any legitimate duty of the police department.") of the Amended Complaint are obviously opinions and/or conclusions of law which the Court is not required to accept as true for purposes of deciding the instant motion.

suspension, Armbruster lost approximately $600.00 in wages. Id. at ¶ 34. In addition, a disciplinary letter was placed on file that Armbruster believes may prevent his promotion to Sergeant. Id. at ¶ 35. Armbruster has also been warned that should he refuse to obey such an order in the future, he would risk termination. Id. at ¶ 36.[3] Armbruster has subsequently only received "menial" assignments and "more significant" assignments have been given to officers of lower seniority. Id. at ¶ 41.[4] Armbruster has been denied training and received a low performance evaluation. Id.[5] Armbruster has asked for some of the punishment to be rescinded. Id. at ¶ 42. Armbruster's request has not been granted. Id. at ¶ 43.

### III. Discussion

#### A. First Amendment Retaliation Claim

To state a First Amendment retaliation claim, a plaintiff must allege two things: (1) that the activity in question is protected by the First Amendment, and (2) that the protected activity was a substantial factor in the alleged retaliatory action. Hill v. Borough of Kutztown, 455 F.3d 225, 241 (3d Cir. 2006); Hill v. City of Scranton, 411 F.3d 118, 125 (3d Cir. 2005).

Here, on the face of the Amended Complaint, Plaintiff's claim fails on the first prong. A public employee's statement is protected by the First Amendment when: (1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not have "an adequate justification for treating the employee

---

[3] The Amended Complaint fails to state who issued such a warning to Armbruster.

[4] The Amended Complaint provides no detail or explanation as to these general allegations.

[5] The remainder of Paragraph 41 of the Amended Complaint consists of legal conclusions which the Court is not required to accept as true for the purpose of deciding the instant Motion.

differently from any other member of the general public" as result of the statement he made. Gorum v. Sessoms, 561 F.3d 179, 185 (3d Cir. 2009) (citing Borough of Kutztown, 455 F.3d at 241 and quoting Garcetti v. Ceballos, 547 U.S. 410, 418 (2006)). In determining whether an employee spoke as a citizen, the Court looks to whether a person spoke pursuant to his or her official duties. See Garcetti, 547 U.S. at 421 (holding that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline"); Gorum, 561 F.3d at 186 (concluding employee was not engaged in "protected citizen speech" because his responsibilities included the subject of his speech and his speech/actions were "made as a public employee engaging in his official duties"). See also, e.g., Davis v. Kinney, 518 F.3d 304, 313 (5th Cir. 2008) (stating that "[a]ctivities undertaken in the course of performing one's job are activities pursuant to official duties and not entitled to First Amendment protection," and noting that Circuits are consistent in holding that when a public employee raises complaints or concerns up the chain of command at his workplace about his job duties/assignments, that speech is undertaken in the course of performing his job).

"Restricting speech that owes its existence to a public employee's professional responsibilities," the Garcetti Court aptly reasoned, "does not infringe any liberties the employee might have enjoyed as a private citizen. Rather, it simply reflects the exercise of employer control over what the employer itself has... created." 547 U.S. at 421. Put another way, the First Amendment does not shield the consequences of "expressions employees make pursuant to their

professional duties." Id. at 426.⁶  The Third Circuit has recently reaffirmed these principles, and highlighted circumstances where the speech at issue was based on special knowledge and experience acquired through the relevant public employment.  See Cindrich v. Fisher, Nos. 06-2615, 07-2969, 2009 WL 1950073, *5-6 (3d Cir. July 8, 2009) (holding speech "in the performance of [the employee's] case assignments, involv[ing] issues pertaining to those cases, and [ ] based on special knowledge and experience [the employee] acquired through her job" was "speech made pursuant to [the employee's] official duties").⁷

      The Court agrees with Defendants that Armbruster fails, on the face of the Amended Complaint, to allege that he engaged in speech by a private citizen during the relevant incident. Armbruster's naked opinions aside, the Amended Complaint demonstrates that the challenged activity fell squarely within Armbruster's police duties.  Armbruster was only present at the demonstration because he was "on the job" and ordered to be there to perform official duties. While on scene, he was performing official duties before and while he was ordered, as part of the Kutztown University Police Department's official crowd control activities, to move certain demonstrators.  On the face of the Amended Complaint, Armbruster only "spoke" in insubordinate response to a direct order issued to him during the conduct of official police business.  Moreover, Armbruster's speech was made to the superior who was directing

---

⁶ This result is consistent with the U.S. Supreme Court's prior emphasis on affording government employers sufficient discretion to manage their operations.  Garcetti, 547 U.S. at 421.

⁷ In addition, where speech has "some potential to affect" a public employer's operations, Garcetti, 126 S.Ct. at 1958, then that employer need not "allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action, Connick v. Myers, 461 U.S. 138, 152 (1983).

Armbruster's official duties, not to any private citizen or in any public context related to the demonstrations. Finally, as the Amended Complaint makes clear, Armbruster's speech was made with the benefit of what he perceived to be knowledge and experience acquired through law enforcement.[8]

Plaintiff's arguments to the contrary – *i.e.*, that Armbruster "did not have to" speak to Mioskie and that he simply spoke to the chief as "any private citizen would" – belie context and are simply inconsistent with the facts as alleged. Plaintiff effectively advances the untenable position that the Amended Complaint pleads Armbruster to have merely been outside with his chief observing the demonstrations and speaking as a member of the public – even going so far as likening Armbruster's on-duty, private, in-response-to-a-command, up-the-chain insubordination to "speech to a TV camera or to the demonstrators" and "the same kind of speech demonstrators make." See Pl's Br. at 28. The Court is not convinced that the allegations of the Amended Complaint support these arguments.[9]

---

[8] Armbruster alleges in the Amended Complaint that he was "*acting with the duty as a law enforcement officer...*" Compl. at ¶ 48 (emphasis added).

[9] The Court notes that Plaintiff even argues that the instant situation was not one of "an employee's complaints or concerns about his own job duties, but merely comments about the public's Constitutional right to peaceful protest." Pl's Br. at 32. Yet Plaintiff's own Amended Complaint explicitly alleges that Armbruster acted as he did because (at least in part) he feared that limiting Repent America's ability to demonstrate would "subject *him* to liability." Id. (emphasis added). Plaintiff cannot have it both ways – he cannot first allege he acted because of concerns about the effect of his job duties and then later argue his job duties were not on his mind in lieu of an overriding concern for the rights of protestors.

In addition, Plaintiff's reliance on Fierro v. City of New York, 591 F. Supp. 2d 431 (S.D.N.Y. 2008) is misplaced. In Fierro, the court found the factual situation involved "instruction to commit acts *clearly outside the scope of [the employee's] duties*." Id. at 442 (emphasis added). No matter how many times Plaintiff repeats that mantra, it is simply not the case as alleged here.

In short, Armbruster spoke while on duty, during his work hours at his place of work, in response to an order from a superior that he chose not to obey, based on knowledge acquired from his law enforcement employment experience. Stated differently, as pleaded, Armbruster's speech would not have occurred were he not actively performing his official duties. As pleaded, Armbruster was plainly complaining about his job function up the chain of command of his department, and caselaw dictates this speech fell within his official duties. In response to Armbruster's workplace insubordination, his superiors were not required to wait until some additional speech and related action or inaction further disrupted the official activities of the police at that time. Accordingly, as alleged in the Amended Complaint, Armbruster's speech falls outside the ambit of First Amendment protection, and, as such, there is no viable basis for claiming that his speech is insulated from public employer discipline such that this claim may proceed.[10] Accordingly, Plaintiff fails to state a claim as a matter of law.

### B. "Right to Refuse to Violate Others' Constitutional Rights" Claim

Perhaps aware of the weakness of his First Amendment claim, Plaintiff attempts also to bring a claim based on a purported violation of his "right to refuse to violate others' constitutional rights." Based on this Court's research, over the past thirty years, no Court of Appeals has held such a right exists. The Court is aware of only one District Court case in this Circuit which has ever so held – <u>Harley v. Schuylkill Cty.</u>, 476 F. Supp. 191 (E.D. Pa. 1979) – and no other court has since cited to that decision for such a principle. As the parties are well

---

[10] This conclusion is buttressed by the facts that courts hold law enforcement agencies have even more latitude than other public employees in responding to disruptive speech of officers because of the special degree of trust and discipline required in a police force. <u>See</u> Def's Br. at 10 (collecting cases).

aware, District Court decisions do not establish the law of the circuit and are not binding on other district courts within the district. Threadgill v. Armstrong World Indus., Inc., 928 F.2d 1366, 1371 (3d Cir. 1991). Plaintiff's arguments for reliance on Harley are unpersuasive. It appears the "right" relied upon in Harley was an independent right based upon substantive due process. Plaintiff basically acknowledges this in his brief, repeatedly asserting a "Fourteenth Amendment claim" (and previously in oral argument referring to a vague "liberty interest").[11]

This Court is not convinced such a right is recognized by superior courts. The U.S. Supreme Court has always been "reluctant to expand the concept of substantive due process because guideposts for responsible decision-making in this unchartered area are scarce and open-ended." Collins v. City of Harker Heights, 503 U.S. 115, 125 (1992) (citing Regents of Univ. of Mich. v. Ewing, 474 U.S. 214, 225-226 (1985)). Following this guidance, lower courts invoke "judicial restraint ... to exercise utmost care" in analyzing whether a complaint states a substantive due process claim. Collins, 503 U.S. at 125.[12] Where the claim is heretofore unrecognized, the appropriate level of restraint is exceedingly high. Given this, and after a survey of the law, this Court finds no basis to depart from the wise course of judicial restraint and break ground by finding a new cause of action based on a fresh liberty interest under the rubric of

---

[11] The Due Process Clause of the Fourteenth Amendment states: "nor shall any State deprive any person of life, liberty, or property, without due process of law." U.S. Constitution, Amend. XIV.

[12] Since Harley, the U.S. Supreme Court has made very clear that (1) claims based on generalized notions of substantive due process are disfavored except in certain explicitly-recognized circumstances, and (2) if a claim is covered by a specific constitutional provision, it must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process. See County of Sacramento v. Lewis, 523 U.S. 833, 843 (1998); Albright v. Oliver, 510 U.S. 266, 273 (1994); Graham v. Connor, 490 U.S. 386, 397 (1989).

substantive due process.  In short,  exercising "utmost care," the Court finds no compelling authority to support the viability of this cause of action.  Accordingly, Plaintiff fails to state a claim as a matter of law.

## IV.  Conclusion

For the foregoing reasons, the Motion to Dismiss will be granted in its entirety.  Because the Court finds yet another attempt to amend the complaint would be futile, the case will be dismissed with prejudice.  An appropriate order follows.